**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN GEARY, derivatively on behalf of CHECKPOINT THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JAMES F. OLIVIERO, III, WILLIAM GARRETT GRAY, CHRISTIAN BÉCHON, SCOTT BOILEN, NEIL HERSKOWITZ, LINDSAY A. ROSENWALD, BARRY SALZMAN, and MICHAEL S. WEISS, <br><br> Defendants, <br><br> and <br><br> CHECKPOINT THERAPEUTICS, INC., <br><br> Nominal Defendant. | Case No.: 1:24-cv-03471 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Kevin Geary ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Checkpoint Therapeutics, Inc. ("Checkpoint Therapeutics" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants James F. Oliviero, III ("Oliviero"), William Garrett Gray ("Gray"), Christian Béchon ("Béchon"), Scott Boilen ("Boilen"), Neil Herskowitz ("Herskowitz"), Lindsay A. Rosenwald ("Rosenwald"), Barry Salzman ("Salzman"), and Michael S. Weiss ("Weiss"), (collectively, the "Individual Defendants," and together with Checkpoint Therapeutics, the "Defendants") for breaches of their

fiduciary duties as directors and/or officers of Checkpoint Therapeutics, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Olivier and Gray for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Checkpoint Therapeutics, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Checkpoint Therapeutics' current and/or former directors and officers from March 10, 2021 until December 15, 2023, both dates inclusive (the "Relevant Period").

2.      Checkpoint Therapeutics is a clinical-stage immunotherapy and targeted oncology company that seeks to "advance[e] the development of cancer immunotherapy and targeted oncology treatments and create[e] accessible, effective and potentially more affordable options for patients everywhere."[1] Checkpoint Therapeutics' leading products are cosibelimad (an antibody product) and olafertinib (a small-molecule, targeted anti-cancer agent). Specifically, cosibelimad

---

[1] https://ir.checkpointtx.com/

is purported to be an antibody licensed in checkpoint therapy-naïve patients with selected recurrent or metastatic cancers, including cohorts in metastatic and locally advanced cutaneous squamous cell carcinoma ("cSCC").

3.     Checkpoint Therapeutics utilizes third-party contract manufacturing organizations ("CMO") to conduct preclinical and clinical trials and manufacture both its pre-commercial and commercial products. The Company's business model of outsourcing the testing, manufacturing, and production of its drug products requires the Company to maintain effective internal controls pertaining to the oversight of the CMOs because the Company is subject to strict regulatory frameworks from agencies such as the U.S. Food and Drug Administration ("FDA").

4.     In January 2023, the Company submitted a Biologics License Application ("BLA") to the FDA requesting for permission to introduce, or deliver for introduction, a biological product into interstate commerce – in this case, to introduce cosibelimab as a treatment for patients with metastatic and locally advanced cSCC who are not candidates for curative surgery or radiation ("cosibelimab BLA").

5.     Throughout the Relevant Period, the Individual Defendants publicly maintained that there was a high probability that the FDA would approve the cosibelimab BLA.

6.     Moreover, the Individual Defendants continuously touted their compliance with regulatory bodies, including the FDA, by maintaining that Checkpoint Therapeutics ensured regulatory compliance by subjecting its third-party contracted manufacturers to stringent oversight.

7.     However, the Individual Defendants' representations about the approvability of the cosibelimab BLA and the internal controls of the Company's manufacturers were far from reality.

In fact, the FDA had identified approvability issues during a multi-sponsor inspection of Checkpoint Therapeutics' CMO for cosibelimab.

8.      The truth emerged on December 18, 2023, when the Company issued a press release disclosing that the FDA did not approve cosibelimab as a treatment for patients with metastatic or locally advance cSCC who are not candidates for curative surgery or radiation.

9.      On this news, the Company's stock price fell $1.49 per share, or 44.88%, from closing at $3.32 per share on December 15, 2023, to closing at $1.83 per share on December 18, 2023 on high trading volume.

10.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

11.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain internal controls while two of the Individual Defendants engaged in lucrative insider trading, reaping personal profits of ***exceeding $347,667***.

12.     Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Checkpoint Therapeutics, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company failed to oversee the conduct of its CMOs; (2) despite its claims that the Company would ensure that the CMOs would conduct their operations under current good manufacturing practice (GMP) regulations, the Company failed to oversee the conduct of its CMOs; (3) the Company was unsuccessful in maintaining control of its CMOs through contractual obligations; (4) the Company downplayed the risk of manufacturing negligence and other non-compliance while simultaneously claiming that the Company imposed

manufacturing standards for its CMOs; (5) contrary to its claims of a positive trajectory regarding the approval of the cosibelimab drug due to "favorable interactions" with the FDA, the issues with its manufacturers greatly diminished actual approval of the drug; (6) as a result, cosibelimab's manufacturing, regulatory, and commercial prospects were highly exaggerated; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud

and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Checkpoint Therapeutics. Plaintiff has continuously held Checkpoint Therapeutics common stock since July 17, 2020.

**Nominal Defendant Checkpoint Therapeutics**

22.     Checkpoint Therapeutics is a Delaware corporation with its principal executive offices at 95 Sawyer Road, Suite 110, Waltham, Massachusetts 02453. Checkpoint Therapeutics' shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "CKPT."

**Defendant Oliviero**

23.     Defendant Oliviero has served as the Company's CEO and President since October 2015 and has served as a Company director since October 2018. According to the Company's Schedule 14A filed with the SEC on April 2, 2024 (the "2024 Proxy Statement"), as of March 19, 2024, Defendant Oliviero beneficially owned 341,780 shares of the Company's common stock, representing 1.0% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $1.85, Defendant Oliviero owned approximately $632,293 worth of Checkpoint Therapeutics common stock as of that date.

24.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Oliviero received $1,641,591 in compensation from the Company. This included $635,580 in salary, $720,000 in stock awards, and $286,011 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Oliviero received $2,042,150 in compensation from the Company. This included $594,000 in salary, $1,151,150 in stock awards, and $297,000 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Oliviero received $2,292,370 in compensation from the Company. This included $540,000 in salary, $1,417,570 in stock awards, and $334,800 in non-equity incentive plan compensation.

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Oliviero made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 10, 2023 | 3,817 | $6.75 | $25,764.75 |
| February 1, 2023 | 10,261 | $4.77 | $48,944.97 |
| February 27, 2023 | 5,548 | $4.65 | $25,798.20 |
| March 2, 2023 | 5,483 | $5.00 | $27,415.00 |

Thus, in total, before the fraud was exposed, he sold 25,109 shares of Company stock on inside information, for which he received approximately $127,923 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.     The 2024 Proxy Statement stated the following about Defendant Oliviero:

***James F. Oliviero, III***
Mr. Oliviero joined our Board of Directors in October 2018 and has served as our Chief Executive Officer and President since October 2015. Mr. Oliviero has nearly twenty-five years of operational experience in the biotechnology industry. From May 2003 to September 2015, Mr. Oliviero served in a variety of leadership capacities at Keryx Biopharmaceuticals, Inc., a publicly traded biotechnology company, most recently as its Chief Financial Officer since April 2009, where he was instrumental in the growth of the company to a market capitalization over $1 billion. During his tenure at Keryx, Mr. Oliviero oversaw all finance, accounting, investor relations, corporate governance, business development and legal matters, as well as a leading member of the design of several clinical studies and the regulatory oversight of Keryx's new drug application for Auryxia®, which successfully obtained FDA marketing approval in 2014 and also gained EMA marketing approval. Also while at Keryx, Mr. Oliviero completed over $500 million in various public financings for the company. Prior to Keryx, from August 1999 to May 2003, Mr. Oliviero was Director of Finance for ACCESS Oncology, Inc., a privately held biotechnology company. Mr. Oliviero began his professional career as an investment banker at Furman Selz LLC in New York City. Since July 2021, Mr. Oliviero has also served on the Board of Directors for Nuvectis Pharma, Inc. Mr. Oliviero is a CFA charterholder and holds a B.B.A. in Finance with Highest Distinction from Emory University's Goizueta Business School. Based on Mr. Oliviero's biotechnology and pharmaceutical industry experience, as well as

his extensive management experience, the Board of Directors believes that Mr. Oliviero has the appropriate set of skills to serve as a member of the Board.

**Defendant Gray**

27. Defendant Gray has served as the Company's CFO since December 2020. According to the Company's 2024 Proxy Statement, as of March 19, 2024, Defendant Gray beneficially owned 145,224 shares of the Company's common stock, representing 0.4% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $1.85, Defendant Gray owned approximately $268,664 worth of Checkpoint Therapeutics stock as of that date.

28. For the 2023 Fiscal Year, Defendant Gray received $712,875 in compensation from the Company. This included $315,000 in salary, $303,750 in stock awards, $85,050 in non-equity incentive plan compensation, and $9,075 in all other compensation. For the 2022 Fiscal Year, Defendant Gray received $712,360 in compensation from the Company. This included $275,000 in salary, $346,610 in stock awards, $82,500 in non-equity incentive plan compensation, and $8,250 in all other compensation. For the 2021 Fiscal Year, Defendant Gray received $748,068 in compensation from the Company. This included $250,000 in salary, $397,130 in stock awards, $93,000 in non-equity incentive plan compensation, and $7,938 in all other compensation.

29. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gray made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 1, 2022 | 37,063 | $2.51 | $93,028.13 |
| March 10, 2022 | 38,197 | $1.89 | $72,192.33 |
| January 10, 2023 | 1,858 | $6.75 | $12,541.50 |
| February 1, 2023 | 3,154 | $4.79 | $15,107.56 |

| February 27, 2023 | 1,914 | $4.66 | $8,919.44 |
| March 2, 2023 | 3,591 | $5.00 | $17,955 |

Thus, in total, before the fraud was exposed, he sold 85,777 shares of Company stock on inside information, for which he received approximately $219,744 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

30.     The 2024 Proxy Statement stated the following about Defendant Gray:

**_Garrett Gray — Chief Financial Officer, Corporate Secretary and Treasurer_**
Mr. Gray has served as our Chief Financial Officer since December 2020, as our Principal Financial Officer since December 2016, and as our Corporate Secretary and Treasurer since January 2018. Mr. Gray served as our Vice President, Finance and Accounting from February 2016 until December 2020. Mr. Gray joined us from Keryx Biopharmaceuticals, Inc., a publicly traded biotechnology company, which he joined in 2013, and where he most recently served as Corporate Controller, helping grow the finance and accounting department during Keryx's transition from a development-stage company to a fully integrated commercial organization. Prior to joining Keryx, Mr. Gray began his professional career with Deloitte & Touche, LLP, where he served as a senior auditor. Mr. Gray has a Bachelor of Science degree in Accounting from Lehigh University and is a Certified Public Accountant in the State of New York.

**Defendant Béchon**

31.     Defendant Béchon has served as a Company director since October 2018. He also serves as a member of the Audit Committee. According to the Company's 2024 Proxy Statement, as of March 19, 2024, Defendant Béchon beneficially owned 32,478 shares of the Company's common stock, representing 0.1% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $1.85, Defendant Béchon owned approximately $60,084 worth of Checkpoint Therapeutics stock as of that date.

32.     For the 2023 Fiscal Year, Defendant Béchon received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock

awards. For the 2022 Fiscal Year, Defendant Béchon received $100,000 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,000 in stock awards. For the 2021 Fiscal Year, Defendant Béchon received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock awards.

33.    The Company's 2024 Proxy Statement stated the following about Defendant Béchon:

**Christian Béchon**
Mr. Béchon joined our Board of Directors in October 2018. He is currently Chairman and Chief Executive Officer of ChB Consultants, a privately held life science consultancy company. From 2006 to 2017, Mr. Béchon was Chairman and Chief Executive Officer of LFB S.A., a French biopharmaceutical company with more than €500M in annual revenue. Previously, he was Senior Advisor for the Boston Consulting Group in 2005 and 2006. Earlier in his career, he held various positions in the French government, including Chief of Staff to the Minister for Public Health and Health Insurance. From 2000 to 2004, he was Deputy Chief of Staff to the Minister of the Economy, Finance and Industry. He is a graduate of the Ecole Centrale des Arts et Manufactures engineering school, Institut d'Etudes Politiques de Paris and Ecole Nationale d'Administration. Mr. Béchon is a member of Quantum Genomics' (ALQGC) Board of Directors and has been a Board member of private companies in the USA, Mexico and Europe. He has received numerous awards and medals, including the Knight of the French Legion of Honor and the French National Order of Merit. Based on Mr. Béchon's biotechnology and pharmaceutical industry experience, as well as his extensive management experience, the Board of Directors believes that Mr. Béchon has the appropriate set of skills to serve as a member of the Board.

**Defendant Boilen**

34.    Defendant Boilen served as a Company director from April 2016 until January 31, 2024. Prior to his resignation from the Company, Defendant Boilen also served as a member of the Audit Committee and as a member of the Compensation Committee.

35.    For the 2023 Fiscal Year, Defendant Boilen received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock awards. For the 2022 Fiscal Year, Defendant Boilen received $100,000 in compensation from the

Company. This included $50,000 in fees earned or paid in cash and $50,000 in stock awards. For the 2021 Fiscal Year, Defendant Boilen received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock awards.

36.     The Company's Schedule 14A filed with the SEC on May 1, 2023 (the "2023 Proxy Statement") stated the following about Defendant Boilen:

> **_Scott Boilen_**
> Mr. Boilen joined our Board of Directors in April 2016. Mr. Boilen has served as the Chief Executive Officer of Allstar Products Group since 1999. He also served on the Board of Directors for the Electronic Retailing Association from 2010 to 2012 and the Board of Directors for the Food Bank for Westchester (New York) since 2009. Mr. Boilen holds a degree in Business Administration from the State University of New York at Albany and a Master's Degree in Business Administration from Fordham University. Based on Mr. Boilen's extensive management experience and in-depth understanding of the Company's business, the Board of Directors believes that Mr. Boilen has the appropriate set of skills to serve as a member of the Board in light of the Company's business and structure.

### Defendant Herskowitz

37.     Defendant Herskowitz has served as a Company director since August 2015. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the Company's 2024 Proxy Statement, as of March 19, 2024, Defendant Herskowitz beneficially owned 35,123 shares of the Company's common stock, representing 0.1% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $1.85, Defendant Herskowitz owned approximately $64,978 worth of Checkpoint Therapeutics stock as of that date.

38.     For the 2023 Fiscal Year, Defendant Herskowitz received $110,001 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $50,001 in stock awards. For the 2022 Fiscal Year, Defendant Herskowitz received $110,000 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $50,000

in stock awards. For the 2021 Fiscal Year, Defendant Herskowitz received $110,001 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $50,001 in stock awards.

39.     The Company's 2024 Proxy Statement stated the following about Defendant Herskowitz:

> **Neil Herskowitz**
> Mr. Herskowitz joined our Board of Directors in August 2015 and has served as the Chairman of our Audit Committee since September 2016. Mr. Herskowitz has served as the managing member of the ReGen Group of companies, located in New York, since 1998, which include ReGen Capital Investments LLC and Riverside Claims Investments LLC. He has also served as the President of its affiliate, Riverside Claims LLC, since June 2004. Mr. Herskowitz received a B.B.A. in Finance from Bernard M. Baruch College in 1978. Based on Mr. Herskowitz's financial industry experience and in-depth understanding of our business, the Board of Directors believes that Mr. Herskowitz has the appropriate set of skills to serve as a member of the Board.

### **Defendant Rosenwald**

40.     Defendant Rosenwald has served as a Company director since Checkpoint Therapeutics' inception in 2014. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Rosenwald beneficially owned 100,123 shares of the Company's common stock, representing 0.3% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $1.85, Defendant Rosenwald owned approximately $185,228 worth of Checkpoint Therapeutics stock as of that date.

41.     For the 2023 Fiscal Year, Defendant Rosenwald received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock awards. For the 2022 Fiscal Year, Defendant Rosenwald received $100,000 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,000

in stock awards. For the 2021 Fiscal Year, Defendant Rosenwald received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock awards.

42.     The Company's 2024 Proxy Statement stated the following about Defendant Rosenwald:

> **Lindsay A. Rosenwald, M.D.**
> Dr. Rosenwald has served as a member of our Board of Directors since inception. From November 2014 to August 2015, he also was our Chief Executive Officer and President. Dr. Rosenwald also serves as Chairman, President and Chief Executive Officer of Fortress Biotech, Inc., as a director of Mustang Bio, Inc., and as Chairman of the Board of Directors of Avenue Therapeutics, Inc. Prior to that, from 1991 to 2008, he served as the Chairman of Paramount BioCapital, Inc. Over the last 23 years, Dr. Rosenwald has acted as a biotechnology entrepreneur and has been involved in the founding and recapitalization of numerous public and private biotechnology and life sciences companies. Dr. Rosenwald received his B.S. in finance from Pennsylvania State University and his M.D. from Temple University School of Medicine. Based on Dr. Rosenwald's biotechnology and pharmaceutical industry experience and in-depth understanding of our business, the Board of Directors believes that Dr. Rosenwald has the appropriate set of skills to serve as a member of the Board.

**Defendant Salzman**

43.     Defendant Salzman has served as a Company director since January 2016. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the Company's 2024 Proxy Statement, as of March 19, 2024, Defendant Salzman beneficially owned 35,123 shares of the Company's common stock, representing 0.1% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $1.85, Defendant Salzman owned approximately $64,978 worth of Checkpoint Therapeutics stock as of that date.

44.     For the 2023 Fiscal Year, Defendant Salzman received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock

awards. For the 2022 Fiscal Year, Defendant Salzman received $100,000 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,000 in stock awards. For the 2021 Fiscal Year, Defendant Salzman received $100,001 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $50,001 in stock awards.

45.     The Company's 2024 Proxy Statement stated the following about Defendant Salzman:

> **_Barry Salzman_**
> Mr. Salzman joined our Board of Directors in January 2016. Mr. Salzman is currently a Managing Director for Compass Partners LLC, a merchant banking and financial advisory firm that specializes in middle market companies and corporate restructuring. Mr. Salzman joined Compass Partners LLC in July 2007, the same time at which he became a Board Member and Principal owner of BP Gamma Medical Supply Company, which he sold in 2021. Prior to July 2007, Mr. Salzman served as Board Chairman, President and Principal owner of Becker-Parkin Dental Supply Company. After 20 years at Becker-Parkin, Mr. Salzman sold the company to Henry Schein Inc. (NASDAQ: HSIC). Five months after selling Becker-Parkin, Mr. Salzman served as President of Surgery Works, LLC, formed by Compass Partners LLC to provide financial management services for Ambulatory Surgery Centers until the centers sold a controlling interest to Amsurg (NASDAQ: AMSG). Mr. Salzman has maintained a Board seat at both Surgery Works, LLC centers and continues to work in a consulting and advisory role to Amsurg. In 2014, Mr. Salzman founded and became President of Practice Management Works LLC and also accepted a board seat at Vivex Corporation, a private research driven Biomedical Company. Since January 2022, Mr. Salzman has also served as Co-President of Vivex Corporation. Mr. Salzman is a 1987 graduate of Brooklyn Law School and is a member in good standing of the New York Bar Association. Based on Mr. Salzman's financial industry experience and in-depth understanding of our business, as well as his extensive management experience, the Board of Directors believes that Mr. Salzman has the appropriate set of skills to serve as a member of the Board.

## **Defendant Weiss**

46.     Defendant Weiss has served as a Company director since March 2015. He also serves as the Chairman of the Board. According to the Company's 2024 Proxy Statement, as of March 19, 2024, Defendant Weiss beneficially owned 80,123 shares of the Company's common stock, representing 0.2% of the Company's total outstanding stock as of that date. Given that the

price per share of the Company's common stock at the close of trading on March 19, 2024 was $1.85, Defendant Weiss owned approximately $148,228 worth of Checkpoint Therapeutics stock as of that date.

47.   For the 2023 Fiscal Year, Defendant Weiss received $110,001 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $50,001 in stock awards. For the 2022 Fiscal Year, Defendant Weiss received $110,000 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $50,000 in stock awards. For the 2021 Fiscal Year, Defendant Weiss received $110,001 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $50,001 in stock awards.

48.   The Company's 2024 Proxy Statement stated the following about Defendant Weiss:

***Michael S. Weiss — Chairman of the Board of Directors***
Mr. Weiss has served as Chairman of our Board of Directors since March 2015. Effective January 1, 2017, the services of Mr. Weiss as Chairman are provided under an Advisory Agreement (the "Advisory Agreement") with Caribe BioAdvisors, LLC (see below). He also served as Interim Chief Executive Officer and President from August 2015 until October 2015 and Executive Chairman from March 2015 to December 2016. Mr. Weiss also serves as a director and Executive Vice Chairman, Strategic Development of Fortress Biotech, Inc., as Chairman of the Board of Directors and Executive Chairman of Mustang Bio, Inc., and as Chairman, President and Chief Executive Officer of TG Therapeutics, Inc., a company he founded in 2011. Mr. Weiss was also a board member of Avenue Therapeutics, Inc. from March 2015 to February 2018 and the Chairman of the Board of National Holding Corporation from September 2016 to June 2018. From 2002 to 2009, Mr. Weiss was the Chairman and Chief Executive Officer of Keryx Biopharmaceuticals, Inc., where he helped the company acquire and develop its lead drug, Auryxia®, as well as executed a strategic alliance for Auryxia with Japan Tobacco, Inc. and Torii Pharmaceutical Co., Ltd. worth more than $100 million. Mr. Weiss began his professional career as a lawyer with Cravath, Swaine & Moore LLP. He earned his J.D. from Columbia Law School and his B.S. in Finance from The University at Albany. Based on Mr. Weiss's biotechnology and pharmaceutical industry experience, as well as his extensive management experience, the Board of Directors believes that Mr. Weiss has the appropriate set of skills to serve as a member of the Board.

Effective January 1, 2017, the Board of Directors of the Company approved and authorized the execution of an advisory agreement (the "Advisory Agreement")

with Caribe BioAdvisors, LLC (the "Advisor"), which is owned by Michael S. Weiss, to provide the Board with the advisory services of Mr. Weiss as Chairman of the Board. Pursuant to the Advisory Agreement, the Advisor is paid an annual cash fee of $60,000, in addition to any and all annual equity incentive grants paid to members of the Board. In June 2023, Mr. Weiss assigned the agreement to Hawkins BioVentures, LLC

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

49.     By reason of their positions as officers and/or directors of Checkpoint Therapeutics and because of their ability to control the business and corporate affairs of Checkpoint Therapeutics, the Individual Defendants owed Checkpoint Therapeutics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Checkpoint Therapeutics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Checkpoint Therapeutics and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Checkpoint Therapeutics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Checkpoint Therapeutics, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Checkpoint Therapeutics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Checkpoint Therapeutics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Checkpoint Therapeutics' Board at all relevant times.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.     To discharge their duties, the officers and directors of Checkpoint Therapeutics were required to exercise reasonable and prudent supervision over the management, policies,

practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Checkpoint Therapeutics were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Checkpoint Therapeutics' own Code of Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Checkpoint Therapeutics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Checkpoint Therapeutics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Checkpoint Therapeutics' operations would comply with all applicable laws and Checkpoint Therapeutics' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to Checkpoint Therapeutics and the shareholders the duty of loyalty requiring that each favor Checkpoint Therapeutics' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Checkpoint Therapeutics and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Checkpoint Therapeutics, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Checkpoint Therapeutics.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Checkpoint Therapeutics was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

63.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Checkpoint Therapeutics and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS OF CHECKPOINT THERAPEUTICS

65.     The Company's Code of Ethics applies to the Company's directors, officers, and employees and it seeks "[t]o promote the ethical conduct and integrity generally of Checkpoint Therapeutics, Inc. (the "Company"), and to promote accurate, fair and timely reporting of the Company's financial results and condition and other information the Company releases to the public market and include in reports it files with the Securities and Exchange Commission (the "SEC")[.]"

66.     At the outset, the Code of Ethics notes that "all directors, officers and employees of the Company are bound by the following Code of Ethics." Specifically, the Code of Ethics states that all directors, officers, and employees shall:

- Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships, including disclosure to the Chairman of the Audit Committee of any material transaction or relationship that reasonably could be expected to give rise to such a conflict.

- Be prohibited from: personally taking advantage of business opportunities that are discovered through the use of corporate property, information or his or her position with the Company; using corporate property, information or his or her position for personal gain; or competing against the Company while an employee.

- Provide information within the scope of his or her duties in a manner which promotes full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, government agencies and in the Company's other public communications.

- Comply with rules and regulations of foreign, federal, state, provincial and local governments, and other appropriate private and public regulatory agencies, including insider trading laws and the Company's insider trading policy.

- Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated.

- Deal fairly with the Company's customers, suppliers, competitors and employees, and not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealings.

- Keep confidential all confidential information, as discussed in more detail below.

- Proactively promote and be an example of ethical behavior.

- Achieve responsible use of and control over all assets and resources employed or entrusted.

- Promptly report to the Chairman of the Audit Committee any conduct that the individual believes to be or would give rise to a violation of law or business ethics or of any provision of this Code of Ethics or the Company's general code of conduct.

67. Under the heading "Confidential Information and Public Disclosures," the Code of Ethics states the following:

As an employee of the Company, you may learn of information about the Company that is confidential and proprietary. You also may learn of information before that information is released to the general public. Employees who have received or have access to confidential information should take care to keep this information confidential. Confidential information includes non-public information that might be of use to competitors or harmful to the Company or its suppliers, vendors or partners if disclosed, such as business, marketing and service plans, financial information, product development, scientific data, manufacturing, clinical trial results, regulatory developments, databases, customer lists, pricing strategies, personnel data, personally identifiable information pertaining to our employees, patients or other individuals (including, for example, names, addresses, telephone numbers and social security numbers), and similar types of information provided to us by our customers, suppliers and partners. This information may be protected by patent, trademark, copyright and trade secret laws. In addition, because the Company interacts with other companies and organizations, there may be times when you learn confidential information about other companies before that information has been made available to the public. You must treat this information in the same manner as you are required to treat the Company's confidential and proprietary information. There may even be times when you must treat as

confidential the fact that the Company has an interest in, or is involved with, another company.

*          *          *

In addition to the above responsibilities, if you are handling information protected by any privacy policy published by the Company, then you must handle that information in accordance with the applicable policy.

It is the Company's policy to disclose material information concerning the Company to the public only through specific limited channels to avoid inappropriate publicity and to ensure that all those with an interest in the Company will have equal access to information. All inquiries or calls from the press and financial analysts should be referred to the Chief Executive Officer or Chief Financial Officer. The Company has designated our Chief Executive Officer and Chief Financial Officer as our official spokespersons for questions concerning the financial performance, strategic direction or operating performance of the Company, and operational issues such a research and development, regulatory developments, sales and marketing, etc. You also may not provide any information to the media about us off the record, for background, confidentially or secretly, including, without limitation, by way of postings on internet websites, chat rooms or "blogs[.]"

68.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, two of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Additionally, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

**CHECKPOINT THERAPEUTICS' AUDIT COMMITTEE CHARTER**

69.     The Company's Audit Committee Charter states that the Audit Committee's primary function is to "assist the Board of Directors in overseeing (1) the accounting and financial

reporting processes of the Company, and (2) the audits of the financial statements of the Company."

70.     Specifically, under the heading "Purpose and Authority," the Audit Committee Charter outlines the Audit Committee's responsibilities:

> The Audit Committee (the "Committee") is a committee appointed by the Board of Directors of Checkpoint Therapeutics, Inc. (the "Company"). Its primary function is to assist the Board of Directors in overseeing (1) the accounting and financial reporting processes of the Company, and (2) the audits of the financial statements of the Company.

> The Committee also prepares a written report to be included in the annual proxy statement of the Company pursuant to the applicable rules and regulations of the Securities and Exchange Commission (the "SEC").

> In furtherance of these purposes, the Committee shall maintain direct communication among the Company's independent auditors and the Board of Directors. The independent auditors and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit review or attest services for the Company shall report directly to the Committee and are ultimately accountable to the Committee and the Board of Directors.

> In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company. The Committee shall have the sole authority to retain at the Company's expense outside legal, accounting or other advisors to advise the Committee and to receive appropriate funding, as determined by the Committee, from the Company for the payment of the compensation of such advisors and for the payment of ordinary administrative expenses of the Committee that are necessary to carry out its duties. The Committee may request any officer or employee of the Company or the Company's outside counsel or independent auditors to attend a meeting of the Committee or to meet with any member of, or advisors to, the Committee. The Committee may also meet with the Company's investment bankers or financial analysts who follow the Company.

71.     Under the heading "Responsibilities of the Committee," the Audit Committee Charter outlines, in relevant part:

> A. *Document/Report Review*.

1. Review and reassess the adequacy of the Audit Committee Charter and the performance of the Committee at least annually, and update the Audit Committee Charter as conditions dictate.
2. Review and discuss with management and the independent auditors the Company's annual and quarterly financial statements and related footnotes and any reports or other financial information submitted to the Company's stockholders, any governmental body, or the public, including any certification, report, opinion, or review rendered by the independent auditors.
3. Meet no less than quarterly with financial management and with the independent auditors to discuss:
   a. The annual audited financial statements and the quarterly financial statements prior to any SEC filings, including, in each case, a review of the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
   b. The type and presentation of information included in press releases of unaudited interim and annual financial results, including, without limitation, the use of "pro forma" or other "adjusted" financial information not prepared in accordance with generally accepted accounting principles.
   c. The type and presentation of financial information and earnings guidance provided to analysts and ratings agencies.
4. Recommend to the Board of Directors whether or not the Company should include its financial statements in its annual report on Form 10-K, based on the Committee's review of the Company's financial statements, its discussions with the independent auditors of the Company's accounting practices and its discussions with the outside auditor concerning independence of the outside auditor.
5. Disclose, as required by the applicable securities laws, in the Company's proxy statement or annual report on Form 10-K, the formal written report of the Committee and all other required information concerning the Committee and its function.
6. Review, in consultation with management, the Company's policies with respect to risk assessment and risk management.
7. Discuss, prior to any public release or filing, the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

*          *          *

C. *Financial Reporting Processes.*
   1. In consultation with the independent auditors, review the integrity of the Company's internal and external financial reporting processes.
   2. Consult with the independent auditors and management about the independent auditors' judgments concerning not only the acceptability, but

also the quality and appropriateness of the Company's accounting principles as applied in its financial reporting.

3. Consider and approve, if appropriate, major changes to the Company's auditing and accounting principles and practices as suggested by the independent auditors or management.

\*          \*          \*

E. *Ethical and Legal Compliance*.
1. Establish, review and update periodically a code of ethical conduct and ensure that management has established a system to enforce this code.
2. Review management's monitoring of the Company's compliance with the Company's code of ethical conduct, and ensure that management has the proper review system in place to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.
3. Establish procedures for (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, and auditing matters, and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.
4. Conduct an appropriate review of all related party transactions for potential conflict of interest situations in accordance with the Company's Management Policy on Related Person Transactions, and approve all related party transactions. For purposes hereof, the term "related party transaction" shall refer to the transactions required to be disclosed pursuant to the SEC's Item 404 of Regulation S-K.
5. Conduct or authorize investigations into any matters within the Committee's scope of responsibilities and retain special independent legal, accounting or other advisors to advise the Committee as necessary to carry out its duties.
6. Review, with Company outside counsel, any legal matter that could have a significant impact on the Company's financial statements.
7. Perform any other activities consistent with the Audit Committee Charter, the Company's Bylaws and governing law, as the Committee or the Board of Directors deems necessary or appropriate.

F. *Limitation of Audit Committee's Role*. While the Committee has the responsibilities and powers set forth in this Audit Committee Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete, accurate and in accordance with generally accepted accounting principles and applicable rules and regulations. The foregoing is the responsibility of management.

72.     In violation of the Audit Committee Charter, Defendants Herskowitz (as chair), Béchon, and Salzman conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Herskowitz, Béchon, and Salzman failed to maintain the accuracy of Company records and reports, failed to comply with laws and regulations, failed to act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and failed to properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

73.     Checkpoint Therapeutics is a pharmaceutical company that seeks to "advance[e] the development of cancer immunotherapy and targeted oncology treatments and create[e] accessible, effective and potentially more affordable options for patients everywhere." [2] Checkpoint Therapeutics' leading drug products are cosibelimad (an antibody product) and olafertinib (a small-molecule, targeted anti-cancer agent). Specifically, cosibelimad seeks to be a licensed antibody treatment for checkpoint therapy-naïve patients with selected recurrent or metastatic cancers, including cohorts in metastatic and locally advanced cSCC.

74.     To provide consumers with its products, Checkpoint Therapeutics uses CMOs to conduct preclinical and clinical trials and manufacture both its pre-commercial and commercial products. The Company's business model of outsourcing the manufacturing and production of its

---

[2] https://ir.checkpointtx.com/

drug products requires the Company to maintain effective internal controls pertaining to the oversight of the CMOs because the Company is subject to strict regulatory frameworks from agencies such as the FDA.

75.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Checkpoint Therapeutics, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company failed to oversee the conduct of its CMOs; (2) despite its claims that the Company would ensure that the CMOs would conduct their operations under current good manufacturing practice (GMP) regulations, the Company failed to oversee the conduct of its CMOs; (3) the Company was unsuccessful in maintaining control of its CMOs through contractual obligations; (4) the Company downplayed the risk of manufacturing negligence and other non-compliance while simultaneously claiming that the Company imposed manufacturing standards for its CMOs; (5) contrary to its claims of a positive trajectory regarding the approval of the cosibelimab drug due to "favorable interactions" with the FDA, the issues with its manufacturers greatly diminished actual approval of the drug; (6) as a result, cosibelimab's manufacturing, regulatory, and commercial prospects were highly exaggerated; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

76.     Additionally, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain internal controls while two of the Individual Defendants engaged in lucrative insider trading, reaping personal profits ***exceeding $347,667***.

**False and Misleading Statements**

***March 9, 2021 Press Release***

77.     On March 9, 2021, after the market closed, Checkpoint Therapeutics issued a press

release announcing the Company's financial results for the fiscal year ended December 31, 2020,

among other recent corporate highlights. The press release highlighted, in relevant part:

> **2020 and Recent Corporate Highlights**
> - In January 2020, Checkpoint announced confirmation of the registration path for cosibelimab in mCSCC. FDA feedback supports the plan to submit a BLA based on data from the ongoing Phase 1 clinical trial.
>
> &ast;   &ast;   &ast;
>
> - Also in November 2020, Checkpoint announced the expansion of a long-term manufacturing partnership for cosibelimab with Samsung Biologics. Building upon an existing contract manufacturing agreement entered into in 2017, Samsung Biologics will provide additional commercial-scale drug substance manufacturing for cosibelimab[.]

78.     The press release also included a statement from Defendant Oliviero, who touted

the Company's momentum in "solidifying the registration path of mCSCC." Specifically,

Defendant Oliviero stated:

> "We are very pleased with our momentum throughout 2020, solidifying the registration path for cosibelimab in metastatic cutaneous squamous cell carcinoma ("mCSCC"), as well as announcing positive interim data from our pivotal Phase 1 program. Checkpoint's registration-enabling study in mCSCC is approximately 90% enrolled, with full enrollment anticipated shortly. We remain on track to report full top-line results in the second half of 2021. With a potentially favorable safety profile and plan to commercialize at a lower net price, we believe cosibelimab, if approved, has the potential to be a market disruptive product in the $25 billion and growing PD-(L)1 class. We look forward to a transformative year as we continue our progress towards our first BLA submission with the U.S. Food and Drug Administration ("FDA") for cosibelimab in 2022."

***March 12, 2021 Form 10-K***

79.     On March 12, 2021, Checkpoint Therapeutics filed its annual report on Form 10-K

with the SEC for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was

signed by Defendants Oliviero, Gray, Weiss, Rosenwald, Boilen, Herskowitz, Salzman, and

Béchon and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Oliviero and Gray attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

80.      Under the heading "Supply and Manufacturing," the 2020 10-K stated that the Company "ha[s] established, or intend to establish, contract manufacturing relationships for the supplies of our product candidates, in each case with a single manufacturer" and that the Company "expect[s] that we will rely on a single contract manufacturer to produce each of our product candidates under current GMP ("cGMP") regulations."

81.      The 2020 10-K also stated that the Company controls compliance over its CMOs "through contractual obligations" and is "required by law to establish adequate oversight and control over raw materials, components and finished products furnished by our third-party . . . contract manufacturers[.]"

82.      The 2020 10-K further stated the following regarding CMOs and their relations to BLAs and the FDA, in relevant part:

> The facilities used by our third-party manufacturers to manufacture our product candidates must be approved by the FDA pursuant to inspections that will be conducted after we submit a[] . . . BLA to the FDA. We are required by law to establish adequate oversight and control over raw materials, components and finished products furnished by our third-party manufacturers, but we do not control the day-to-day manufacturing operations of, and are dependent on, our third-party manufacturers for compliance with cGMP regulations for manufacture of our product candidates.

83.      The 2020 10-K further maintained that, in relevant part, "[w]e are exposed to the risk of employee fraud or other misconduct" that "could include intentional failures to . . . comply with manufacturing standards we have established."

***March 28, 2022 Press Release***

84.     On March 28, 2022, the Company issued a press release reporting Checkpoint Therapeutics' 2021 Fiscal Year financial results, among other things. The press release quoted Defendant Oliviero, who stated the following, in relevant part:

> The past year represented a truly transformational period for Checkpoint Therapeutics, with the foundation laid for multiple significant potentially value enhancing catalysts in 2022. Following the positive topline results from our ongoing registrational trial of cosibelimab in metastatic [cSCC] announced earlier this year, we look forward to a planned [BLA] submission for cosibelimab later in 2022 . . . . We remain focused on expeditiously advancing our pipeline of product candidates with the goal of expanding patient access globally to potentially life-saving novel oncology therapies through a disruptive pricing strategy.

***March 28, 2022 Form 10-K***

85.     On March 28, 2022, Checkpoint Therapeutics filed its annual report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by Defendants Oliviero, Gray, Weiss, Rosenwald, Boilen, Herskowitz, Salzman, and Béchon and contained SOX certifications signed by Defendants Oliviero and Gray attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

86.     The 2021 10-K contained substantively the same statements as in the 2020 10-K as referenced in ¶¶ 81-83.

***April 29, 2022 Proxy Statement***

87.     On April 29, 2022, Checkpoint Therapeutics filed the Company's proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement") notifying shareholders of the 2022 Annual Meeting of Shareholders, to be held on June 15, 2022. Defendants Oliviero, Weiss, Boilen,

Herskowitz, Rosenwald, Salzman, and Béchon solicited the 2022 Proxy Statement, filed pursuant

to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

88.    The 2022 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-

election of Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon;

and (2) the ratification of the appointment of BDO USA, LLP as the Company's independent

registered public accounting firm for the 2022 Fiscal Year.

89.    Regarding the Company's Code of Ethics, the 2022 Proxy Statement provided, in

relevant part:

> We have adopted a Code of Ethics ("the Code") which applies to all of our
> directors and employees, including our principal executive officer and principal
> financial officer. The Code includes guidelines dealing with the ethical handling
> of conflicts of interest, compliance with federal and state laws, financial
> reporting, and our proprietary information. The Code also contains procedures
> for dealing with and reporting violations of the Code. We have posted our Code
> of Ethics on our website, located at *www.checkpointtx.com*.

90.    Regarding the Board's role in "Corporate Governance," the 2022 Proxy Statement

provided, in relevant part:

> Checkpoint has a risk management program overseen by James Oliviero, our
> President and Chief Executive Officer, and the Board. Mr. Oliviero and
> management identify material risks and prioritize them for our Board. Our
> Board regularly reviews information regarding our credit, liquidity, operations,
> and compliance as well as the risks associated with each.

91.    Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and

Béchon caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter*

*alia,* that: (1) the Company failed to oversee the conduct of its CMOs; (2) despite its claims that

the Company would ensure that the CMOs would conduct their operations under current good

manufacturing practice (GMP) regulations, the Company failed to oversee the conduct of its

CMOs; (3) the Company was unsuccessful in maintaining control of its CMOs through contractual

obligations; (4) the Company downplayed the risk of manufacturing negligence and other non-compliance while simultaneously claiming that the Company imposed manufacturing standards for its CMOs; (5) contrary to its claims of a positive trajectory regarding the approval of the cosibelimab drug due to "favorable interactions" with the FDA, the issues with its manufacturers greatly diminished actual approval of the drug; (6) as a result, cosibelimab's manufacturing, regulatory, and commercial prospects were highly exaggerated; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

92.     The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as the Individual Defendants violated the Code of Ethics, including by allowing false and misleading statements to be issued to the investing public.

93.     As a result of Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify the appointment of BDO USA, LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

### *August 12, 2022 Press Release*

94.     On March 12, 2022, the Company issued a press release reporting Checkpoint Therapeutics' second quarter of 2022 financial results, among other things. The press release quoted Defendant Oliviero, who stated, in relevant part, that "[o]ver the past few months, we have

made substantial progress towards the regulatory submission for, and potential approval of, cosibelimab for the treatment of [cSCC]"; and that, "[i]mportantly, we successfully completed our pre-BLA meetings with the FDA in July, reaching agreement on all key aspects discussed with regard to the upcoming BLA submission[.]"

95.     The press release also stated the following, in relevant part:

• In July 2022, Checkpoint successfully completed two pre-BLA meetings with the FDA (chemistry, manufacturing and controls [CMC] and clinical/nonclinical). Based upon favorable interactions with the agency, the planned BLA submission will include both the metastatic and locally advanced indications. Checkpoint also reached agreement with the FDA on all key aspects discussed with regard to the content of the upcoming BLA submission.

***November 8, 2022 Press Release***

96.     On November 8, 2022, the Company issued a press release reporting Checkpoint Therapeutics' third quarter of 2022 financial results, among other things. The press release contained substantially the same statements regarding the Company's alleged "successful" pre-BLA meetings and "favorable" communications with the FDA as referenced above in ¶ 97.

***January 4, 2023 Press Release***

97.     On January 4, 2023, the Company issued a press release "announc[ing] the submission of a [BLA] to the [FDA] for the approval of cosibelimab . . . as a treatment for patients with metastatic [cSCC] or locally advanced cSCC who are not candidates for curative surgery or radiation." The press release stated, in relevant part, that "[t]he BLA submission is based on positive efficacy and safety results from Checkpoint's ongoing registration-enabling, multi-regional, multicohort clinical trial evaluating cosibelimab . . . in patients with selected recurrent or metastatic cancers"; and that "[b]ased upon interactions with the FDA, the BLA submission includes both the metastatic and locally advanced cSCC indications."

98.    The press release quoted Defendant Oliviero, who stated, in relevant part, that the BLA submission for cosibelimab was "a major milestone for Checkpoint Therapeutics" and that, "[b]ased on its compelling and differentiated product profile and the positive data generated to date, we believe cosibelimab has the potential to be an important treatment option for patients."

### March 2, 2023 Press Release

99.    On March 2, 2023, the Company issued a press release that announced the FDA had accepted the cosibelimab BLA for filing while boasting that "[t]he FDA has set a Prescription Drug User Fee Act ('PDUFA') goal date of January 3, 2024" and that, "[i]n its BLA filing acceptance letter, the FDA indicated that no potential filing review issues have been identified, and that an advisory committee meeting to discuss the application is not currently planned."

### March 30, 2023 Press Release

100.   On March 30, 2023, the Company issued a press release reporting Checkpoint Therapeutics' 2022 Fiscal Year financial results, among other things. The press release quoted Defendant Oliviero, who stated that, in relevant part, "[t]he past year was a momentous one for Checkpoint, and we began 2023 with the submission of our [BLA] to the [FDA] seeking approval of cosibelimab . . . as a treatment for patients with metastatic or locally advanced [cSCC] who are not candidates for curative surgery or radiation"; and that the "initial indication for cosibelimab represents a potential $1.6 billion U.S. market opportunity[.]"

101.   The press release also stated the following about the FDA's review of the cosibelimab BLA:

> • Checkpoint submitted a BLA to the FDA seeking approval of cosibelimab in January 2023. In March 2023, the FDA accepted for filing the BLA for cosibelimab and set a PDUFA goal date of January 3, 2024. In its BLA filing acceptance letter, the FDA indicated that no potential filing review issues have been identified, and that an advisory committee meeting to discuss the application is not currently planned.

* * *

• In July 2022, Checkpoint successfully completed two pre-BLA meetings with the FDA (chemistry, manufacturing and controls and clinical/non-clinical). Based upon favorable interactions with the agency, the January 2023 BLA submission included both the metastatic and locally advanced cSCC indications. Checkpoint also reached agreement with the FDA on all key aspects discussed regarding the content of the BLA submission.

**March 31, 2023 Form 10-K**

102.    On March 31, 2023, Checkpoint Therapeutics filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Oliviero, Gray, Weiss, Rosenwald, Boilen, Herskowitz, Salzman, and Béchon and contained SOX certifications signed by Defendants Oliviero and Gray attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

103.    The 2022 10-K contained substantively the same statements as in the 2020 10-K as referenced in ¶¶ 81-83.

**May 1, 2023 Proxy Statement**

104.    On May 1, 2023, Checkpoint Therapeutics filed the 2023 Proxy Statement with the SEC, notifying shareholders of the 2023 Annual Meeting of Shareholders, to be held on June 12, 2023. Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

105.    The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon to the Board; (2) the ratification of the appointment of KPMG LLP as the Company's independent

public accountants for the 2023 Fiscal Year; (3) the approval of an amendment to the Company's amended and restated certificate of incorporation ("Certificate of Incorporation") to increase the amount of authorized shares of common stock by 30,000,000 shares from 50,000,000 to 80,000,000; and (4) the approval of an amendment to the Company's Amended and Restated 2015 Incentive Plan ("2015 Incentive Plan"), as amended, to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000.

106.    As noted above, the 2023 Proxy Statement solicited shareholder approval for an additional 3,000,000 shares for issuance under the 2015 Incentive Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the 2015 Incentive Plan who would not have approved the 2015 Incentive Plan had they been informed of the true financial state of the Company and the wrongdoing alleged herein. According to the 2023 Proxy Statement, the 2015 Incentive Plan's purpose "is to promote our success by linking the personal interests of our employees, officers, directors and consultants to those of our stockholders, and by providing participants with an incentive for outstanding performance" and is to be administered by the Compensation Committee.

107.    The 2015 Incentive Plan authorized the Compensation Committee to grant awards in any of the following forms: options to purchase shares, stock appreciation rights, restricted stock, restricted stock units, deferred stock units, other discretionary awards, and discretionary cash-based awards.

108.    The 2023 Proxy Statement stated that the 2015 Incentive Plan "currently includes authorization for 3,000,000 shares. As of the record date, there were 702,614 shares of our common stock remaining available for the grant of equity awards under the 2015 Incentive Plan. The additional 3,000,000 shares requested under the 2015 Incentive Plan, together with

the remaining shares under the 2015 Incentive Plan, represent the shares the Company anticipates needing for the next 3 years under normal circumstances."

109.    Regarding the Company's Code of Ethics, the 2023 Proxy Statement provided, in relevant part:

> We have adopted a Code of Ethics ("the Code") which applies to all of our directors and employees, including our principal executive officer and principal financial officer. The Code includes guidelines dealing with the ethical handling of conflicts of interest, compliance with federal and state laws, financial reporting, and our proprietary information. The Code also contains procedures for dealing with and reporting violations of the Code. We have posted our Code of Ethics on our website, located at *www.checkpointtx.com*.

110.    Regarding the Board's role in "Corporate Governance," the 2023 Proxy Statement provided, in relevant part:

> Checkpoint has a risk management program overseen by James Oliviero, our President and Chief Executive Officer, and the Board. Mr. Oliviero and management identify material risks and prioritize them for our Board. Our Board regularly reviews information regarding our credit, liquidity, operations, and compliance as well as the risks associated with each.

111.    Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company failed to oversee the conduct of its CMOs; (2) despite its claims that the Company would ensure that the CMOs would conduct their operations under current good manufacturing practice (GMP) regulations, the Company failed to oversee the conduct of its CMOs; (3) the Company was unsuccessful in maintaining control of its CMOs through contractual obligations; (4) the Company downplayed the risk of manufacturing negligence and other non-compliance while simultaneously claiming that the Company imposed manufacturing standards for its CMOs; (5) contrary to its claims of a positive trajectory regarding the approval of the cosibelimab drug due to "favorable interactions" with the FDA, the issues with its manufacturers

greatly diminished actual approval of the drug; (6) as a result, cosibelimab's manufacturing, regulatory, and commercial prospects were highly exaggerated; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

112.   The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as the Individual Defendants violated the Code of Ethics, including by allowing false and misleading statements to be issued to the investing public.

113.   As a result of Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of KPMG LLP as the Company's independent public accountants for 2023 Fiscal Year; (3) the approval of an amendment to the Certificate of Incorporation to increase the amount of authorized shares of common stock by 30,000,000 shares from 50,000,000 to 80,000,000; and (4) the approval of an amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000.

### *May 15, 2023 Press Release*

114.   On May 15, 2023, the Company issued a press release reporting Checkpoint Therapeutics' first quarter of 2023 financial results, among other things. The press release reported that "[i]n its BLA filing acceptance letter, the FDA indicated that no potential filing review issues

have been identified." The press release also quoted Defendant Oliviero, by stating the following in relevant part:

> The first quarter of 2023 began a transformative year for Checkpoint, with our January submission of a [BLA] for cosibelimab in patients with metastatic or locally advanced [cSCC], followed by the FDA's acceptance of the BLA filing in March, in which they indicated that no potential filing review issues have been identified and that an advisory committee meeting to discuss the application is not currently planned . . . . We continue to prepare for a potential commercial launch in 2024[.]

* * *

> If approved, based on its compelling efficacy and safety profile, we believe cosibelimab has the potential to capture significant market share in this $1.6 billion U.S. market opportunity[.]

### August 14, 2023 Press Release

115.    On August 14, 2023, the Company issued a press release reporting Checkpoint Therapeutics' second quarter of 2023 financial results, among other things. The press release also quoted Defendant Oliviero, who stated the following, in relevant part:

> We continue to work with the [FDA] toward the January 3, 2024 action date for our [BLA] for cosibelimab. Recently, our mid-cycle communication meeting with the FDA was successfully completed, and the FDA noted that no significant review issues . . . have been identified in their review to date[.]

### October 18, 2023 Press Release

116.    On October 18, 2023, the Company issued a press release that announced more positive clinical data in support of cosibelimab's regulatory and commercial prospects relating to the treatment of patients with metastatic cSCC. The press release also quoted Defendant Oliviero, who stated, in relevant part, that "[w]e continue to work with the [FDA] toward the January 3, 2024, action date for our [BLA] for cosibelimab."

### November 13, 2023 Press Release

117.    On November 13, 2023, the Company issued a press release reporting Checkpoint Therapeutics' third quarter of 2023 financial results, among other things. The press release also quoted Defendant Oliviero, who stated that "[t]he January 3, 2024, action date for our [BLA] for cosibelimab is fast-approaching, and we continue to work closely with the [FDA] in completing their review." The press release also stated the following about the cosibelimab BLA:

  • Checkpoint submitted a BLA to the FDA seeking approval of cosibelimab in January 2023. In March 2023, Checkpoint announced the FDA accepted the BLA filing for cosibelimab and set a Prescription Drug User Fee Act ("PDUFA") goal date of January 3, 2024. The FDA has indicated that an advisory committee meeting to discuss the application is not planned.

118.    The statements referenced in ¶¶ 77-86, 94-103, and 114-117 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to oversee the conduct of its CMOs; (2) despite its claims that the Company would ensure that the CMOs would conduct their operations under current good manufacturing practice (GMP) regulations, the Company failed to oversee the conduct of its CMOs; (3) the Company was unsuccessful in maintaining control of its CMOs through contractual obligations; (4) the Company downplayed the risk of manufacturing negligence and other non-compliance while simultaneously claiming that the Company imposed manufacturing standards for its CMOs; (5) contrary to its claims of a positive trajectory regarding the approval of the cosibelimab drug due to "favorable interactions" with the FDA, the issues with its manufacturers greatly diminished actual approval of the drug; (6) as a result, cosibelimab's manufacturing, regulatory, and commercial prospects were highly exaggerated; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, statements about the Company's business,

operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

## The Truth Emerges

### December 18, 2023 Press Release

119.    The truth emerged on December 18, 2023, when the Company issued a press release disclosing that the FDA did not approve cosibelimab as a treatment for patients with metastatic or locally advance cSCC who are not candidates for curative surgery or radiation. The press release revealed the following, in relevant part:

> [T]he [FDA] has issued a complete response letter ("CRL") for the cosibelimab [BLA] for the treatment of patients with metastatic or locally advanced [cSCC] who are not candidates for curative surgery or radiation. The CRL . . . cites findings that arose during a multi-sponsor inspection of Checkpoint's third-party [CMO] as approvability issues to address in a resubmission.
>
> * * *
>
> "As the only deficiencies relate to the FDA's inspection of our third-party [CMO], we believe we can address the feedback in a resubmission to enable marketing approval in 2024," said [Defendant] Oliviero, President and Chief Executive Officer of Checkpoint. "We are committed to working closely with our third-party manufacturer and the FDA on our resubmission in order to make cosibelimab available to patients living with cSCC."

120.    On this news, the Company's stock price fell $1.49 per share, or 44.88%, from closing at $3.32 per share on December 15, 2023, to closing at $1.83 per share on December 18, 2023 on high trading volume.

## DAMAGES TO CHECKPOINT THERAPEUTICS

121.    As a direct and proximate result of the Individual Defendants' conduct, Checkpoint Therapeutics has lost and expended, and will continue to lose and expend, many millions of dollars.

122.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

124.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

125.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

126.     As a direct and proximate result of the Individual Defendants' conduct, Checkpoint Therapeutics has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

127.     Plaintiff brings this action derivatively and for the benefit of Checkpoint Therapeutics to redress injuries suffered, and to be suffered, as a result of the Individual

Defendants' breaches of their fiduciary duties as directors and/or officers of Checkpoint Therapeutics, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

128.    Checkpoint Therapeutics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

129.    Plaintiff is, and has been at all relevant times, a shareholder of Checkpoint Therapeutics. Plaintiff will adequately and fairly represent the interests of Checkpoint Therapeutics in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

130.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

131.    A pre-suit demand on the Board of Checkpoint Therapeutics is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Oliviero, Béchon, Herskowitz, Rosenwald, Salzman, and Weiss (the "Director-Defendants") and non-party Amit Sharma (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

132.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

133.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

134.   The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Risk management and compliance protocols, especially regarding revenue projections, accounting procedures, and financial reporting, are an integral part of the Company's business. As an entity operating in a federally regulated industry, maintaining adequate risk management and compliance procedures lie at the core operations of Checkpoint Therapeutics. The maintenance of risk management and compliance procedures was highly material to the Company's core operations, as evidenced by numerous references in the Company's public filings and press releases issued during the Relevant Period.

135.   As Board members of Checkpoint Therapeutics charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Checkpoint Therapeutics, the Director-Defendants must have been aware of the material facts regarding the issues plaguing Checkpoint Therapeutics' risk management systems and accounting procedures.

136.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Checkpoint Therapeutics to issue materially false and misleading statements. Specifically, the Director-Defendants caused Checkpoint Therapeutics to issue false and misleading statements which were intended to make Checkpoint Therapeutics appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

137.   Additional reasons that demand on Defendant Oliviero is futile follow. Defendant Oliviero has served as the Company's CEO and President since October 2015 and as a Company director since October 2015. Thus, as the Company admits, he is non independent director. He receives handsome compensation for his role at the Company, including $1,641,591 in 2023, $2,042,150 in 2022, and $2,292,370 in 2021. As a trusted, long-time Company director and the Company's highest officer, he is directly responsible for all, and personally made many, of the false and misleading statements alleged herein, and he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Oliviero personally signed the 2020 10-K, the 2021 10-K, and the 2022 10-K, all of which contained materially false and misleading statements and omissions. Moreover, Defendant Oliviero solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of all of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company,  led to approval of an

amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000, and led to the approval of an amendment to the Certificate of Incorporation to increase the amount of authorized shares of common stock by 30,000,000 shares from 50,000,000 to 80,000,000. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $127,923. For these reasons, too, Defendant Oliviero breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Béchon is futile follow. Defendant Béchon has served as a Company director since October 2018. He also serves as a member of the Audit Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Béchon personally signed the 2020 10-K, the 2021 10-K, and the 2022 10-K, all of which contained materially false and misleading statements and omissions. Moreover, Defendant Béchon solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of all of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company, led to approval of an amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000, and led to the approval of an amendment to the Certificate of Incorporation to increase the amount of authorized shares of common stock by 30,000,000 shares from 50,000,000 to 80,000,000. For these reasons, too,

Defendant Béchon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.   Additional reasons that demand on Defendant Herskowitz is futile follow. Defendant Herskowitz has served as a Company director since August 2015. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Herskowitz personally signed the 2020 10-K, the 2021 10-K, and the 2022 10-K, all of which contained materially false and misleading statements and omissions. Moreover, Defendant Herskowitz solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of all of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company, led to approval of an amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000, and led to the approval of an amendment to the Certificate of Incorporation to increase the amount of authorized shares of common stock by 30,000,000 shares from 50,000,000 to 80,000,000. For these reasons, too, Defendant Herskowitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.   Additional reasons that demand on Defendant Rosenwald is futile follow. Defendant Rosenwald has served as a Company director since 2014. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the

scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Rosenwald personally signed the 2020 10-K, the 2021 10-K, and the 2022 10-K, all of which contained materially false and misleading statements and omissions. Moreover, Defendant Rosenwald solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of all of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company, led to approval of an amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000, and led to the approval of an amendment to the Certificate of Incorporation to increase the amount of authorized shares of common stock by 30,000,000 shares from 50,000,000 to 80,000,000. For these reasons, too, Defendant Rosenwald breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Salzman is futile follow. Defendant Salzman has served as a Company director since January 2016. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Salzman personally signed the 2020 10-K, the 2021 10-K, and the 2022 10-K, all of which contained materially false and misleading statements and omissions. Moreover, Defendant Salzman solicited the 2022 Proxy Statement and 2023 Proxy

Statement, both of which contained material misrepresentations and omissions that led to the re-election of all of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company, led to approval of an amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000, and led to the approval of an amendment to the Certificate of Incorporation to increase the amount of authorized shares of common stock by 30,000,000 shares from 50,000,000 to 80,000,000. For these reasons, too, Defendant Salzman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Weiss is futile follow. Defendant Weiss has served as a Company director since March 2015. He also serves as the Chairman of the Board. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Weiss personally signed the 2020 10-K, the 2021 10-K, and the 2022 10-K, all of which contained materially false and misleading statements and omissions. Moreover, Defendant Weiss solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of all of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company, led to approval of an amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000, and led to the approval of an amendment to the Certificate of Incorporation to increase the amount of authorized shares of

common stock by 30,000,000 shares from 50,000,000 to 80,000,000. For these reasons, too, Defendant Weiss breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.   Additional reasons that demand on the Board is futile follow.

144.   Defendants Béchon (as Chair), Salzman, and Herskowitz (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

145.   Defendants Salzman (as Chair), Boilen, and Herskowitz (the "Compensation Committee Defendants") served as members of the Compensation Committee at all relevant times. As such, they were responsible for determining the compensation of the Company's officers and directors, including the Director-Defendants through the implementation of the 2015 Incentive Plan that was amended by the Company's shareholders as a result of the Director-Defendants soliciting the 2023 Proxy Statement which contained false and misleading statements and omitted material facts. In particular, the Compensation Committee Defendants ensured that certain of the

Individual Defendants were motivated to issue false and misleading statements and to artificially inflate the growth and overall performance of the Company by awarding the Individual Defendants' compensation—through stock awards issued under the 2015 Incentive Plan. In the 2023 Fiscal Year, the Compensation Committee Defendants provided personal material benefits to all of the Director-Defendants in the form of stock awards issued pursuant to the 2015 Incentive Plan while the Director-Defendants were breaching their fiduciary duties to the Company. Specifically, Defendants Herskowitz, Salzman, Boilen, Béchon, Weiss, and Rosenwald each received $50,001, respectively, in stock awards pursuant to the amended 2015 Incentive Plan for the 2023 Fiscal Year. However, these amounts pale in comparison to the staggering material personal benefits Defendant Oliviero received. Pursuant to the amended 2015 Incentive Plan, in the 2023 Fiscal Year alone, Defendant Oliviero received $720,000 in stock awards. Therefore, Defendants Oliviero, Béchon, Weiss, and Rosenwald are unable to independently and disinterestedly assess a demand against the Compensation Committee Defendants as they have received, and continue to receive, material personal benefits from them. Moreover, all of the Director-Defendants—including the Compensation Committee Defendants—breached  their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

146.    All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

147.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and the Company's insider trading policy. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

148.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

149.    The acts complained of herein constitute violations of fiduciary duties owed by Checkpoint Therapeutics' officers and directors, and these acts are incapable of ratification.

150.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Checkpoint Therapeutics. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Checkpoint Therapeutics, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

151.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Checkpoint Therapeutics to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

152.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

155.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. § 240.14a-9.

156.    Under the direction and watch of the Individual Defendants, the 2022 Proxy

Statement and the 2023 Proxy Statement failed to disclose that: (1) the Company failed to oversee

the conduct of its CMOs; (2) despite its claims that the Company would ensure that the CMOs

would conduct their operations under current good manufacturing practice (GMP) regulations, the

Company failed to oversee the conduct of its CMOs; (3) the Company was unsuccessful in

maintaining control of its CMOs through contractual obligations; (4) the Company downplayed

the risk of manufacturing negligence and other non-compliance while simultaneously claiming

that the Company imposed manufacturing standards for its CMOs; (5) contrary to its claims of a

positive trajectory regarding the approval of the cosibelimab drug due to "favorable interactions"

with the FDA, the issues with its manufacturers greatly diminished actual approval of the drug; (6)

as a result, cosibelimab's manufacturing, regulatory, and commercial prospects were highly

exaggerated; and (7) the Company failed to maintain adequate internal controls. As a result of the

foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

157.    Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's and the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

158.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement and the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement and the 2023 Proxy Statement, including the election of directors, the approval of an amendment to the 2015 Incentive Plan that increased the number of shares available under the plan, and the ratification of the appointment of an independent registered public accounting firm.

159.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders voted, *inter alia*, to re-elect Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon to the Board, thus allowing them to continue breaching their fiduciary duties to Checkpoint Therapeutics.

160.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

161.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted to re-elect Defendants Oliviero, Weiss, Boilen, Herskowitz, Rosenwald, Salzman, and Béchon to the Board, thus allowing them to continue breaching their fiduciary duties to Checkpoint Therapeutics and approved an amendment to the 2015 Incentive Plan to increase the shares of common stock available for issuance thereunder by 3,000,000 shares from 3,000,000 to 6,000,000.

162.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

163.    Plaintiff, on behalf of Checkpoint Therapeutics, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Checkpoint Therapeutics' business and affairs.

166.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Checkpoint Therapeutics.

168.    In breach of their fiduciary duties owed to Checkpoint Therapeutics, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to oversee the conduct of its CMOs; (2) despite its claims that the Company would ensure that the CMOs would conduct their operations under current good manufacturing practice (GMP) regulations, the Company failed to oversee the conduct of its CMOs; (3) the Company was unsuccessful in maintaining control of its CMOs through contractual obligations; (4) the Company downplayed the risk of manufacturing negligence and other non-compliance while simultaneously claiming that the Company imposed manufacturing standards for its CMOs; (5) contrary to its claims of a positive trajectory regarding the approval of the cosibelimab drug due to "favorable interactions" with the FDA, the issues with its manufacturers greatly diminished actual approval of the drug; (6) as a result, cosibelimab's manufacturing, regulatory, and commercial prospects were highly exaggerated; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

169.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

170.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

171.    In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $347,667.

172.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Checkpoint Therapeutics' securities.

173.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Checkpoint Therapeutics' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

174.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

175.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Checkpoint Therapeutics has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.     Plaintiff, on behalf of Checkpoint Therapeutics, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

177.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Checkpoint Therapeutics.

179.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Checkpoint Therapeutics that was tied to the performance or artificially inflated valuation of Checkpoint Therapeutics, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

180.     Plaintiff, as a shareholder and a representative of Checkpoint Therapeutics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-

based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

181.    Plaintiff, on behalf of Checkpoint Therapeutics, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

184.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Checkpoint Therapeutics to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

185.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

186.    Plaintiff, on behalf of Checkpoint Therapeutics, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Checkpoint Therapeutics in a manner consistent with the operations of a publicly held corporation.

189.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Checkpoint Therapeutics has sustained and will continue to sustain significant damages.

190.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

191.   Plaintiff, on behalf of Checkpoint Therapeutics, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

192.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Checkpoint Therapeutics, for which they are legally responsible.

194.   As a direct and proximate result of the Individual Defendants' abuse of control, Checkpoint Therapeutics has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.   Plaintiff, on behalf of Checkpoint Therapeutics, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Oliviero and Gray for Contribution Under Sections 10(b) and 21D of the Exchange Act

196.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.     Checkpoint Therapeutics and Defendants Oliviero and Gray are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Oliviero's and Gray's willful and/or reckless violations of their obligations as officers and/or directors of Checkpoint Therapeutics.

198.     Defendants Oliviero and Gray, because of their positions of control and authority as officers and/or directors of Checkpoint Therapeutics, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Checkpoint Therapeutics, including the wrongful acts complained of herein and in the Securities Class Action.

199.     Accordingly, Defendants Oliviero and Gray are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

200.     As such, Checkpoint Therapeutics is entitled to receive all appropriate contribution or indemnification from Defendants Oliviero and Gray.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Checkpoint Therapeutics, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Checkpoint Therapeutics;

(c)    Determining and awarding to Checkpoint Therapeutics the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Checkpoint Therapeutics and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Checkpoint Therapeutics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Checkpoint Therapeutics to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Checkpoint Therapeutics restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.


Dated: May 6, 2024                          Respectfully submitted,

                                            **THE BROWN LAW FIRM, P.C.**

                                            */s/    Timothy Brown*
                                            Timothy Brown
                                            Saadia Hashmi
                                            767 Third Avenue, Suite 2501
                                            New York, NY 10017
                                            Telephone: (516) 922-5427
                                            Facsimile: (516) 344-6204
                                            Email: tbrown@thebrownlawfirm.net
                                                     shashmi@thebrownlawfirm.net

                                            *Counsel for Plaintiff*

# **VERIFICATION**

I, Kevin Geary, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1\_\_ day of May, 2024.

DocuSigned by:

_AE19D89EA6B541A..._

Kevin Geary